**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

KATHLEEN STRANG,        :
                                    :
        Plaintiff,         :
v.                          :        CASE NO.:  1:12-CV-72 (LJA)
                                    :
THE CITY OF ALBANY, GEORGIA,  :
*et al.*,                       :
                                    :
        Defendants.      :
                                    :

## <u>ORDER</u>

Before the Court is Defendants' Motion for Summary Judgment.  (Doc. 109 (the "Motion").)  For the reasons articulated below, the Motion is **GRANTED**.

### BACKGROUND

Plaintiff initiated this action *pro se* on May 10, 2012, against Defendants Willie Adams, Dorothy Hubbard, Christopher Pike, Roger Marietta, Bob Langstaff, Tommie Postell, Alfred Lott, C. Nathan Davis, and the City of Albany, referred to herein collectively as "Defendants."  (Doc. 1.)  Defendants include the City of Albany, the Mayor of the City, members of the City Commission, the City Manager, the City Attorney, and other employees of the City.  Plaintiff subsequently filed the First Amended Complaint and the Second Amended Complaint (Doc. 35 (the "SAC")), which is the operative complaint.  Plaintiff alleges therein that she is a "white female citizen of the State of Georgia," who "worked as assistant city attorney at Defendant City of Albany from March 2006 to June 2010."  (Doc. 35 at 2-3.)  She claims she was terminated and subjected to "public ridicule and humiliation" for exercising her First Amendment right to free speech when she reported her discovery of a handgun in a desk in the City Attorney's Office.  (Doc. 35 at 3-4.)  Plaintiff alleges that Defendants retaliated against her by "attempt[ing] to damage her future employment prospects by publicly and falsely labeling her a negligent attorney."  (Doc. 35 at 3.) Furthermore, Plaintiff claims she was subjected to racial discrimination through a hostile

work environment and disparate treatment, and was "replaced by a significantly younger black female." (Doc. 35 at 3.)  Plaintiff asserted her claims against the individual defendants in their personal capacities.  (Doc. 35.)

In response, Defendants filed two motions to dismiss the SAC. (Docs. 37, 39.)  These motions were granted in part on September 12, 2013.  (Doc. 66.)  The Court[1] explained that it "glean[ed] the following causes of action from [Plaintiff's] complaint:    (1) First Amendment retaliation arising from her termination; (2) First Amendment retaliation arising from other alleged retaliatory acts; (3) race-based hostile work environment; and (4) race-based disparate treatment."  (Doc. 66 at 6.)  Upon ruling on the motions to dismiss and a subsequent motion for reconsideration, the Court concluded that Plaintiff's case would proceed on the following claims: (1) First Amendment retaliation against Alfred Lott in his personal capacity and against the City of Albany arising from Plaintiff's termination; (2) First Amendment retaliation against C. Nathan Davis in his personal capacity arising from retaliatory acts other than Plaintiff's termination; (3) First Amendment retaliation against Willie Adams, Dorothy Hubbard, Christopher Pike, Roger Marietta, Bob Langstaff, Tommie Postell, Lott, and Davis in their personal capacities arising from the decision to hold closed, executive sessions and news reports about Plaintiff's employment and her alleged racism and negligence as an attorney; (4) Race discrimination from a hostile work environment under 42 U.S.C. § 1983 against Davis in his personal capacity; and (5) Race discrimination from disparate treatment under 42 U.S.C. § 1983 against Lott in his personal capacity and against the City of Albany. (Docs. 66 at 19-20; 69 at 3.)

On March 15, 2016, Defendants filed the Motion for Summary Judgment on Plaintiff's remaining claims.  (Doc. 109.)  Plaintiff filed her response on May 13, 2016 (Doc. 134), and Defendants filed their reply on May 25, 2016 (Doc. 136).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment when the party contends that no genuine issue of material fact remains and the party is

---

[1]      This case was assigned to Judge W. Louis Sands and was reassigned to the undersigned on December 22, 2014, after the Order on the Motion to Dismiss was entered. *See generally* Docket.

entitled to judgment as a matter of law. Fed. R. Civ. P. 56. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Grimes v. Miami Dade Cty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc)).

"An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict in its favor. *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646. The Court shall, however, "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24; *Barreto*, 331 F. App'x at 673. Local Rule 56 further requires that "documents and other record materials relied upon by [the moving party] be clearly identified for the court." M.D. Ga. L.R. 56. "Material facts not supported by specific citation to particular

parts of materials in the record and statements in the form of issues or legal conclusions (rather than material facts) will not be considered by the court." *Id.*

"When that burden has been met, the burden shifts to the nonmovant . . . to go beyond the pleadings and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 556-57 (11th Cir. 2014) (internal citations omitted). "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56; *see also Mason v. George*, 24 F. Supp. 3d 1254, 1260 (M.D. Ga. 2014).

"In the Eleventh Circuit, a district court cannot grant a motion for summary judgment based on default or as a sanction for failure to properly respond." *U.S. v. Delbridge*, 2008 WL 1869867, at *3 (M.D. Ga. Feb. 22, 2008) (citing *Trustees of Central Pension Fund of Int'l Union of Operating Eng'rs and Participating Emp'rs v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1039 (11th Cir. 2004)). Rather, the Court is "required to make an independent review of the record" and assess the merits of the arguments before deciding the summary judgment motion; however, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Mason*, 24 F. Supp. 3d at 1260-61 (explaining that a court is not obligated to "read minds" or "construct arguments or theories" that a party did not raise).

## STATEMENTS OF MATERIAL FACTS

Plaintiff's Response to Defendants' Statement of Undisputed Facts is comprised almost entirely of responses that fail to comply with the Local Rules. Per Local Rule 56, Plaintiff was to submit a response "to each of the movant's numbered material facts." M.D. Ga. L.R. 56. "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." *Id.* Further, Plaintiff, as the respondent, "may not assert insufficient knowledge to admit or deny a material fact

asserted by the movant unless the respondent has complied with the provisions of Rule 56(d) of the Federal Rules of Civil Procedure." *Id.*

Plaintiff repeatedly disputes Defendants' statements on the ground that she "[l]ack[s] sufficient knowledge to admit or deny." (*E.g.*, Doc. 134-3 ¶¶ 11, 23, 30, 100-10, 157-61.) As such responses do not comply with Rule 56(d) or Local Rule 56, the Court deems admitted each of Defendants' statements to which Plaintiff responded by asserting she lacked sufficient knowledge. Plaintiff also repeatedly responded to Defendants' statements by merely stating, "Deny" (*e.g.*, Doc. 134-3 ¶¶ 241-43, 245-47, 251-52), and by "[a]dmit[ting] in part" without providing any explanation about what part Plaintiff admits or about what the basis is for her response (*e.g.*, Doc. 134-3 ¶¶ 91, 95, 98, 115, 116). Likewise, each of Defendants' statements to which Plaintiff merely responded by admitting in part or by merely denying without explanation is deemed admitted.

In conjunction with her response to Defendants' Statement of Undisputed Facts, Plaintiff submitted her own Statement of Material Facts in Dispute. (Doc. 134-2.) Theses statements improperly are asserted in the form of issues and legal conclusions. (*E.g.*, Doc. 134-2 ¶¶ 1 ("Whether the major and city defendants participated in the decision to terminate Plaintiff's employment."), 4 ("Whether defendant Lott engaged in racially discriminatory practices at the City."), 8 ("Whether defendant Davis actively encouraged officer 'disruption' and animosity against Plaintiff after she reported a crime he committed.").) Local Rule 56 provides that any party's statements of "[m]aterial facts . . . in the form of issues or legal conclusions (rather than material facts) will not be considered by the court." M.D. Ga. L.R. 56. Accordingly, the Court does not consider the assertions in Plaintiff's Statement of Material Facts in Dispute. *See* M.D. Ga. L.R. 56. The Court has, however, considered the record evidence cited in Plaintiff's Statement of Material Facts in Dispute, which she claims demonstrate that genuine issues of material fact exist in this matter.

## SUMMARY OF FACTS

The municipal government of the City of Albany ("the City") consists of six commissioners and the mayor, who collectively comprise the Board of City Commissioners ("the Board"). (Docs. 109-1 ¶ 1; 134-3 ¶ 1.) During the relevant time, the Board appointed

and set the compensation for certain City officers, including the City Manager and the City Attorney.  (Docs. 109-1 ¶¶ 2, 3; 134-3 ¶¶ 2, 3.)

In August 2005, the Board appointed Defendant Lott, a black man, as the City Manager.  (Doc. 109-11 at 2; *see also* Docs. 109-1 ¶¶ 41, 43; 134-3 ¶¶ 41, 43.)  The City Manager had the power and duty to appoint and employ all necessary employees of the City, except for (1) those officers and employees whom the Board appointed or elected and (2) employees of the departments outside of the City Manager's jurisdiction.  (Docs. 109-1 ¶ 6; 134-3 ¶ 6.)  As to those employees under the City Manager's jurisdiction, the City Manager had the power to fix their compensation, subject to the Board's supervision, control, or disapproval, and the power to terminate their employment without the Board's consent and without assigning any reason therefor.  (Docs. 109-1 ¶¶ 8, 9; 134-3 ¶¶ 8, 9.)  All City officers and employees who were appointed and employed by the City Manager were at-will employees of the City.  (Docs. 109-1 ¶ 7; 134-3 ¶ 7.)

Defendant Davis, a white man, was appointed by the Board as City Attorney on July 1, 2003.[2]  (Docs. Docs. 109-1 ¶¶ 29, 30; 109-8 at 9; 134-3 ¶¶ 29, 30.)  The City Attorney acted as legal advisor, attorney, and counsel to the City and its officers in matters related to their official duties, and was also appointed as the City's legal representative in litigation concerning the City (Docs. 109-1 ¶¶ 15-17; 134-3 ¶¶ 15-17.)  Davis was directly responsible to the Board and was not under the City Manager's supervision.  (Doc. 109-8 at 9; *see also* Docs. 109-1 ¶ 32; 134-3 ¶ 32.)  The Board provided him an office and a single staff member—Stacie H. Mote, a white woman, who was an administrative secretary.  (Doc. 109-8 at 10; *see also* Docs. 109-1 ¶ 34; 134-3 ¶ 34.)  In 2005, Mote began serving as the paralegal and real estate specialist for the City Attorney's office, and Christine Washington, a black woman, was hired as the administrative legal secretary for the City Attorney's office.  (Doc. 109-8 at 10-11; *see also* Docs. 109-1 ¶¶ 35-36, 38-39; 134-3 ¶ -36, 38-39.)  The staff of the City Attorney's office, while under the City Attorney's immediate supervision, fell under the

---

[2]     Janice Allen Jackson, a black woman, was the City Manager at the time.  (Docs. 109-1 ¶ 31; 134-3 ¶ 31.)  She resigned from the position at the end of December 2004.  (Doc. 109-8 at 11; *see also* Docs. 109-1 ¶ 40; 134-3 ¶ 40.)

ultimate jurisdiction, supervision, and control of the City Manager.  (Docs. 109-1 ¶¶ 19, 37; 134-3 ¶¶ 19, 37.)

## I.     Plaintiff's Employment as an Assistant City Attorney

In early 2006, the City approved the hiring of an Assistant City Attorney, whose duties would include representing the City's interests in court and administrative agencies, interpreting and ensuring department compliance with laws, and initiating actions necessary to correct violations.  (Doc. 109-8 at 11; *see also* Docs. 109-1 ¶¶ 52, 53; 134-3 ¶¶ 52, 53.) Plaintiff Kathleen Strang, a white woman, applied for the position and accepted an offer on March 2, 2006.  (Docs. 109-1 ¶¶ 44, 54; 134-3 ¶¶ 44, 54.)  Davis recommended the hiring of Plaintiff and his recommendation was approved by Lott.  (Docs. 109-1 ¶¶ 44, 54; 134-3 ¶¶ 44, 54.)  As set forth in the job description for the Albany Assistant City Attorney posted in February 2006, Plaintiff's express job duties were to: "Interpret[] laws, rulings and regulations for the City and/or its employees"; "[ensure] departmental compliance with all applicable City codes, laws, rules, regulations, standards, policies and procedures"; "initiate[] any actions necessary to correct violations"; and "[perform] the duties of City Attorney in absence of same." (Docs. 109-1 ¶¶ 83; 134-3 ¶ 83.)

As part of her duty to ensure compliance with city codes, laws, rules, etc., Plaintiff made several reports regarding infractions by various city employees. For example, Plaintiff reported to Davis that:

- A police officer of the City was unqualified for the position of police captain in part because the officer had purchased a term paper written by another person.  (Docs. 109-1 ¶¶ 85-86; 134-3 ¶¶ 85-86.)  Plaintiff reported the police officer because "it was a clear wrongdoing that suggested to me that the person should not have been a candidate for a promotion to captain." (Docs. 109-1 ¶ 86; 134-3 ¶ 86.)

- A City building inspector was issuing fraudulent housing inspections and then offering to correct the alleged construction problems he identified by moonlighting as a general contractor.  (Docs. 109-1 ¶ 87; 134-3 ¶ 87.)  Plaintiff immediately reported the scheme to Davis upon learning of it because "[Davis] was the City Attorney and it was wrongdoing." (Docs. 109-1 ¶ 88; 134-3 ¶ 88.)

- The Risk Manager at the time had committed an act of "finger jabbing" a subordinate employee and that "(b)y law, the finger jabbing would constitute misdemeanor assault." (Docs. 109-1 ¶ 89; 134-3 ¶ 89.)

At the end of 2006, because Plaintiff's office was cluttered with her storage of to-be-recycled material and because Plaintiff left for vacation without first cleaning her office, Davis asked Mote, Washington, and Strum, Plaintiff's secretary, to clean Plaintiff's office and discard the accumulated materials. (Docs. 109-1 ¶ 66; 134-3 ¶ 66.) Davis asked Plaintiff on several prior occasions to clean her office and to do something about the accumulated materials, but Plaintiff failed to do so. (Docs. 109-1 ¶¶ 65, 66; 134-3 ¶¶ 65, 66.) Plaintiff returned to her office in January 2007 and "was very, very upset" and "felt extremely violated" that her recycling and other materials inside her desk had been discarded. (Docs. 109-1 ¶¶ 67, 68; 134-3 ¶¶ 67, 68.) She repeatedly stated loudly, "I feel raped; I feel raped; I feel raped," so that the entire office could hear her. (Docs. 109-1 ¶ 68; 134-3 ¶ 68.)

In March of 2008, Jenise Shicole Smith, a black woman, began an unpaid internship in the City Attorney's office while she sought to pass the Georgia Bar examination. (Doc. 109-8 at 12-13; *see also* Docs. 109-1 ¶¶ 73-76; 134-3 ¶¶ 73-76.) Davis was pleased with Smith's performance during the internship and, with Lott's approval, hired Smith as an Assistant City Attorney at the end of her internship. (Doc. 109-8 at 13; *see also* Docs. 109-1 ¶ 81; 134-3 ¶ 81.) This offer of employment was made despite the description for the position requiring that a candidate have at least three years of experience practicing law, which Smith did not have. (Doc. 134-1 at 3.) Smith was paid a paralegal's salary until she attained admission to the Georgia Bar, at which time her salary increased. (Doc. 109-8 at 13; *see also* Docs. 109-1 ¶ 81; 134-3 ¶ 81.)

In 2009, Shurell Byrd, a black woman and friend of Plaintiff, had a conversation with Plaintiff about racism exhibited by her immediate boss, who routinely used a racial slur. (Docs. 109-1 ¶ 94; 134-3 ¶ 94.) Because there was "zero tolerance" for this improper behavior, Plaintiff reported to Davis that Byrd's boss called black people, "N****rs." (Docs. 109-1 ¶ 95; 134-3 ¶ 95.) Plaintiff's comment to Davis was overheard by Smith, who talked to Plaintiff afterwards and asked Plaintiff to refrain from using that term. (Docs. 109-1 ¶ 96;

134-3 ¶ 96.)   Thereafter, Plaintiff immediately entered Mote's office because she was "furious" and "said the word 'N****r, N****r, N****r, N****r, N****r, N****r, N****r' just like George Carlin did his, you know, five — seven dirty words in the English language." (Docs. 109-1 ¶ 97; 134-3 ¶ 97.)   Plaintiff testified that this "had nothing to do with calling Jenise Smith a N****r."   (Docs. 109-1 ¶ 97; 134-3 ¶ 97.)   Plaintiff was "ridiculing" the fact that, even though Smith knew the context and that Plaintiff "was not using a racial slur," Smith "still came to [Plaintiff] as if [Plaintiff] had."   (Docs. 109-1 ¶¶ 98, 99; 134-3 ¶¶ 98, 99.) Beginning in the fall of 2009, Plaintiff openly and actively sought employment elsewhere. (Docs. 109-1 ¶ 117; 134-3 ¶ 117.)

## II. Plaintiff's Coaching Plan

On January 4, 2010, the Board met with Davis to evaluate his yearly performance as City Attorney. (Doc. 109-8 at 14-15; *see also* Docs. 109-1 ¶¶ 101, 102-04; 134-3 ¶¶ 101, 102-04.) The Board reminded Davis that the major issue in his past review was Plaintiff's bad behavior. (*Id.*) The Board asked Davis whether Plaintiff's behavior had improved, noted that certain department heads would not work with Plaintiff, and noted that she had been insensitive to other employees' feelings regarding her reading aloud of the "N" word.   (Doc. 109-8 at 14-15; *see also* Docs. 109-1 ¶¶ 101, 102-04; 134-3 ¶¶ 101, 102-04.)   The Board directed Davis to share with Plaintiff the Board's concerns about her behavior, to explain that Davis was being held responsible for such behavior, to place Plaintiff on a six-month improvement plan, and to report her progress to the Board.   (Doc. 109-8 at 15-16; *see also* Docs. 109-1 ¶ 106; 134-3 ¶ 106.)

Davis, together with EEO Manager Niger Thomas and the HR Director, crafted a Coaching Plan for Plaintiff, effective January 8, 2010, informing her that Davis had received numerous and continuing complaints about her behavior.   (Doc. 109-8 at 16-17; *see also* Docs. 109-1 ¶ 108; 134-3 ¶ 108.)   The Coaching Plan further stated that, because of these complaints and Davis' observation of Plaintiff's poor working relationships, City officials required Plaintiff to (1) attend or schedule to attend a training class focused on conflict resolution or team building within 30 days and (2) develop a written strategy within 90 days to strengthen her ability to create a collegial atmosphere.   (Doc. 109-8 at 17; *see also* Docs.

109-1 ¶ 109; 134-3 ¶ 109.)  Plaintiff was informed that immediate disciplinary action, including possible dismissal, would result if she was the subject of continued complaints, if she did not attend twelve counseling sessions, or if she exhibited poor involvement in any phase of the 90-day Coaching Plan.  (*See* Doc. 109-8 at 17; *see also* Docs. 109-1 ¶ 110; 134-3 ¶ 110.)

Plaintiff's relationship with Davis and Smith deteriorated during the term of her Coaching Plan. Davis asked Plaintiff to socialize with Smith and make her feel welcome in the office, but Plaintiff thought this was inappropriate for Davis to dictate.  (Docs. 109-1 ¶ 115; 134-3 ¶ 115.)  Plaintiff was also unhappy about the distribution of work, alleging that Davis assigned tasks to her that would normally be given to a beginning attorney and gave Smith the things that would be given to a senior attorney.  (Docs. 109-1 ¶ 118; 134-3 ¶ 118.) Plaintiff alleges Davis "shoveled . . . twelve cases" to Smith, an "incompetent and inexperienced attorney."  (Docs. 109-1 ¶ 119; 134-3 ¶ 119.)  Davis allowed Smith to handle an employment termination matter that Plaintiff believed she should have been able to handle given her experience and her belief that Smith was incompetent, inexperienced, and naïve.  (Docs. 109-1 ¶ 116; 134-3 ¶ 116.)  Additionally, when Mote went on maternity leave, Plaintiff became the person mostly responsible for answering the office phone.  (Docs. 109-1 ¶¶ 120, 121; 134-3 ¶¶ 120, 121.)

Plaintiff alleges Davis gave Smith, because Smith was black, other opportunities he did not afford Plaintiff, such as "puff-ball situations" for Smith, whereby she could make presentations to City officials on uncontroversial matters.  (Docs. 109-1 ¶ 125; 134-3 ¶ 125; *see also* Doc. 134-1 at 3.)  Meanwhile, Davis did not allow Plaintiff to make presentations to the Board, even to provide updates on litigation where she was counsel of record.  (Doc. 134-1 at 2.)  When Plaintiff raised this disparity to Davis, he replied, "And you're never going to [make a presentation], either."  (Doc. 134-1 at 3.)

In 2010, Plaintiff spoke to Davis about a seminar in Las Vegas. (Doc. 134-1 at 1.) Davis responded by stating that nobody from the office would ever attend out-of-state training, which he later reiterated, loudly to nobody in particular in the office, that he would not authorize any out-of-state training for anyone in the City Attorney's office.  (Doc. 134-1

at 2.)  Less than two weeks later, Smith informed Plaintiff that Davis had authorized her to attend a seminar in Washington, D.C.  (Doc. 134-1 at 2; *see also* Docs. 109-1 ¶¶ 136-37; 109-8 at 18; 134-3 ¶¶ 136-37.)  Plaintiff did not ask Davis whether she could attend the same out-of-state seminar or any other out-of-state training after Davis approved Smith's trip, assuming he would deny any such request because of his "repeatedly stated policy."  (Doc. 134-1 at 2; *see also* Docs. 109-1 ¶¶ 136-37; 109-8 at 18; 134-3 ¶¶ 136-38.)

## III.   Plaintiff's Discovery of the Handgun

Plaintiff alleges that at some point in March 2010, Davis entered her office and swept something that was on top of her desk into the trash can.  (Docs. 109-1 ¶ 142; 134-3 ¶ 142.)  This angered Plaintiff, as she decided she was "going to teach him a lesson."  (Docs. 109-1 ¶ 142; 134-3 ¶ 142.)  Plaintiff went into Davis' office, intending to "find a document and make it disappear, and it didn't matter what it was, but [she] wanted it to be something that would be a work product thing."  (Docs. 109-1 ¶ 143; 134-3 ¶ 143.)  She believed that "it would make him crazy that it was missing."  (Docs. 109-1 ¶ 143; 134-3 ¶ 143.)  She ultimately "couldn't quite bring [her]self to do it" and, instead, opened the top left-hand drawer of Davis' desk and found a handgun.  (Docs. 109-1 ¶ 144; 134-3 ¶ 144.)  Upon seeing the gun, Plaintiff became "frightened, because [she] really thought that [Davis] had that gun there because he intended to point it at [her]," because "in [her] mind's eye that man hated [her] guts, and he hated [her] guts so much that when [Plaintiff] saw that gun there, [she] thought that that's why it was there."  (Docs. 109-1 ¶ 145; 134-3 ¶ 145.)  Davis had never threatened to do bodily harm to Plaintiff or shoot her prior to her finding the gun.  (Docs. 109-1 ¶ 146; 134-3 ¶ 146.)

Thereafter, Plaintiff spoke to Thomas about the discovery of the handgun because Thomas "was a personal friend and she was the EEO person. . . . We shared viewpoints about certain senior city officials and about the way things were done, they were crazy." (Docs. 109-1 ¶ 154; 134-3 ¶ 154.)  Plaintiff felt she needed to get this off her chest and telling Thomas made it less of a burden and made it feel less dangerous because somebody else would know.  (Docs. 109-1 ¶ 155; 134-3 ¶ 155.)  She further told Thomas that she needed to talk in confidence and Thomas needed to promise that it would not go any

further.  (Docs. 109-1 ¶¶ 150, 151; 134-3 ¶¶ 150, 151.)   Later, when Thomas and Plaintiff met after work in Plaintiff's office, Plaintiff said, "I need to show you something," and then opened Davis's drawer and showed Thomas the gun.  (Docs. 109-1 ¶ 152; 134-3 ¶ 152.) Plaintiff forced Thomas to promise not to mention this to anybody because she feared that she would be fired if Thomas said anything about it, and she expected Thomas to honor her confidence until Plaintiff could decide on a course of action.  (Docs. 109-1 ¶¶ 153, 156; 134-3 ¶¶ 153, 156.)

On April 1, 2010, Davis met with Adams, Lott, and another City employee Assistant City Manager James Taylor, and was informed by Adams that a member of his staff had reported that he had a pistol in his office.  (Doc. 109-8 at 19; *see also* Docs. 109-1 ¶ 157; 134-3 ¶ 157.)   Adams stated that any action concerning the discovery of weapons in his desk would have to go before the City Commission.  (Doc. 109-8 at 20; *see also* Docs. 109-1 ¶ 160; 134-3 ¶ 160.)   After the meeting, Adams told Plaintiff that the meeting was about a gun in the office.  (Docs. 109-1 ¶ 162; 134-3 ¶ 162.)   As a result, Plaintiff arranged to meet Thomas at a coffee shop and "exploded at [Thomas] for violating [her] confidence."  (Docs. 109-1 ¶ 163; 134-3 ¶ 163.)   Thomas, in response, told Plaintiff that she considered the gun to be an act of workplace violence that warranted Thomas, in good conscience as a City employee, to report it.  (Docs. 109-1 ¶ 163; 134-3 ¶ 163.)

On April 5, 2010, Lott sent an e-mail to Adams, the Board, and the Assistant City Managers regarding Davis' handgun, wherein he recommended that the Board enter into negotiations with Davis "to attain his voluntary termination or force the issue."  (Doc. 109-11 at 5; *see also* Docs. 109-1 ¶ 170; 134-3 ¶ 170.)   On April 6, the Board met in a closed executive session to investigate whether Davis' action had violated any City policy.  (Doc. 109-8 at 20; *see also* Docs. 109-1 ¶ 172; 134-3 ¶ 172.)   Following three closed executive sessions, the Board did not adopt Lott's recommendation; rather, the Board unanimously decided in an open meeting on Tuesday, April 20, 2010, to suspend Davis for 3 days without pay.  (Doc. 109-11 at 6; *see also* Docs. 109-1 ¶ 173; 134-3 ¶ 173.)   Davis was put on administrative leave without pay from April 21 to 23, 2010, and returned to full duty as City Attorney on Monday, April 26, 2010.  (Doc. 109-8 at 21; *see also* Docs. 109-1 ¶ 174; 134-3

¶ 174.)   Plaintiff was not involved in the Board's investigation or decision to discipline Davis.  (Docs. 109-1 ¶ 175; 134-3 ¶ 175.)

On Tuesday, April 27, 2010, employees in the City Attorney's Office went to an Administrative Professionals lunch with Washington, the administrative legal secretary. (Docs. 109-1 ¶¶ 181, 184; 134-3 ¶¶ 181, 184.)  Plaintiff did not attend the lunch because she went to see Thomas.   (Docs. 109-1 ¶ 183; 134-3 ¶ 183.)  The next day, Washington confronted Plaintiff and told her that "you are required to attend a mandatory staff meeting at 2:00 this afternoon."  (Docs. 109-1 ¶ 185; 134-3 ¶ 185.)  When Plaintiff arrived at the meeting, Washington ordered Plaintiff to apologize for embarrassing the office by reporting Davis' gun and repeatedly told Plaintiff she should be fired.  (Docs. 109-1 ¶ 187; 134-3 ¶ 187.)  Smith also "attacked" Plaintiff for three hours by criticizing her work, her handling of a case, and for pretending to work long hours.  (Docs. 109-1 ¶ 188; 134-3 ¶ 188.)  Plaintiff alleges that, although Davis did not participate in the meeting or personally attack her, he "authorized the staff meeting," likely at the luncheon that Plaintiff had missed. (Docs. 109-1 ¶ 192; 134-3 ¶ 192.)

On May 5, 2010, Davis, "in the context of a weekly counseling session with the EEO Manager, requested [Plaintiff's] immediate resignation, allegedly based on office discord." (Docs. 109-1 ¶ 193; 134-3 ¶ 193.)  The next day, Plaintiff prepared a written Grievance/Discrimination Complaint[3] against Davis addressed to Thomas and copied to Lott. (Docs. 109-1 ¶ 194; 134-3 ¶ 194.)  In the complaint/grievance, Plaintiff requested an immediate transfer. (Docs. 109-1 ¶ 195; 134-3 ¶ 195.)  Unbeknownst to her and to Lott, Lott could not make a final decision concerning Plaintiff's grievance because Davis was an appointee of the Board and, therefore, was not under Lott's jurisdiction.  (*See* Docs. 109-1 ¶¶ 198-201; 134-3 ¶ 198-201.)

---

[3]      In the complaint/grievance, Plaintiff alleged disparate treatment, discrimination based on age and race, and claimed the threat of termination violated her First Amendment rights, "based upon [her] disclosing to the EEO Manager the fact that Mr. Davis, a public official, brought a handgun into a publically owned/operated building in violation of state law."  (Docs. 109-1 ¶ 195; 134-3 ¶ 195.)  She further claimed she had been retaliated against based upon her "participation in the EEO counseling process and based upon [her] report to the EEO manager that Mr. Davis had a gun on City property."  (Docs. 109-1 ¶ 195; 134-3 ¶ 195.)

On May 6, 2010, Thomas also prepared a memorandum[4] for Mayor Adams concerning "the workplace environment in the City Attorney's Office" including "poor staff relations and longstanding inter-office conflicts" and "palpable tension, mistrust and disrespect." (Docs. 109-1 ¶ 196; 134-3 ¶¶ 196-197.)   Thomas stated that "[d]ue to the uniqueness of [Plaintiff's] grievance, and Mr. Davis' difficulty with managing staff relations, legal counsel should be sought prior to rendering any termination decisions." (*Id.*)

On May 11, the Board held a closed executive session, which Plaintiff attended.  (*See* Docs. 109-1 ¶ 204; 134-3 ¶ 204.)   Lott was not involved in the Board's executive session. (Doc. 109-11 at 8; *see also* Docs. 109-1 ¶ 205; 134-3 ¶ 205.)   During the session, Plaintiff alleges that Adams "immediately attacked [Plaintiff]" for paying her city-issued cellphone bill late and for doing work outside of the City Attorney's office.  (Docs. 109-1 ¶ 207; 134-3 ¶ 207.)   Some Board members, including Postell and Marietta, asked Plaintiff questions and made comments about people not getting along and Plaintiff not being liked.  (Docs. 109-1 ¶¶ 208-12; 134-3 ¶¶ 208-12.)

On Wednesday, May 19, 2010, the Board held a second closed executive session to consult with Melanie Slaton, an attorney hired to provide advice about the personnel problems in the City Attorney's office.  (Docs. 109-1 ¶ 216; 134-3 ¶ 216.)

## IV.   Termination of Plaintiff's Employment

On May 25, 2010, Plaintiff received a Notice of Recommendation of Dismissal from Davis.  (Docs. 109-1 ¶ 217; 134-3 ¶ 217.)   Davis   gave   numerous   reasons   for   his recommendation:

---

[4]   Thomas noted that Plaintiff "went through Mr. Davis' desk to 'show him what it feels like' to have someone go through his office" and, in the process, found a gun; that Davis was "subsequently suspended for three days without pay for this action"; that the City Attorney's Office's "employees are now locking their doors due to [Plaintiff's] behavior and her inability to create positive work relationships with her colleagues"; that, "[i]n light of this belief, Mr. Davis requested that [Plaintiff] tender her resignation or request an immediate transfer."  (Docs. 109-1 ¶ 197; 134-3 ¶ 197.)   Thomas further stated that, "[d]ue to a previous employee grievance, and the coaching plan, there is a documented record on [Plaintiff's] inappropriate behavior in the workplace"; that "[Plaintiff] refused to submit her resignation and subsequently filed a retaliation/discrimination complaint against Mr. Davis"; and that "[a]s is the case in all matters concerning an appointed official, the Mayor and City Commissioners have full discretion in determining and recommending the best intervention to resolve managerial concerns." (Docs. 109-1 ¶ 197; 134-3 ¶ 197.)

- Della Strum, a black woman who was hired as Plaintiff's secretary (Doc. 109-8 at 12; *see also* Docs. 109-1 ¶ 59; 134-3 ¶ 59) resigned from her position in June 2008 because of Plaintiff's conduct.  (Docs. 109-1 ¶ 218; 134-3 ¶ 218.)

- For years, Plaintiff spoke disparagingly of City officials and employees. (Docs. 109-1 ¶ 219; 134-3 ¶ 219.)

- For several years, Plaintiff engaged in verbal outbursts that included racially derogatory and sexist language, which included calling a co-worker a "bitch."  (*See* Docs. 109-1 ¶ 220; 134-3 ¶ 220.)

- Plaintiff failed to reimburse the City for personal use of her city-issued cell phone and long distance charges.  (Docs. 109-1 ¶ 221; 134-3 ¶ 221.)

- Plaintiff missed depositions in October 2009 in the *Vy Chu* case after being explicitly instructed to attend the depositions, resulting in the City's interests being unrepresented in the depositions.  (Docs. 109-1 ¶¶ 222-23; 134-3 ¶¶ 222-23.)

- Plaintiff failed to attend a training class focused on conflict resolution or team building within 30 days of the start of her Coaching Plan.  (Docs. 109-1 ¶ 224; 134-3 ¶ 224.)

- Plaintiff failed to develop or produce a written strategy to strengthen her ability to create an atmosphere of teamwork and collegial engagement within 90 days of the start of her Coaching Plan.  (Docs. 109-1 ¶ 224; 134-3 ¶ 224.)

- Plaintiff failed to complete an online course concerning Interpersonal Communication that was required in the Coaching Plan.  (Docs. 109-1 ¶¶ 225, 228; 134-3 ¶¶ 225, 228.)

On June 22, 2010, Plaintiff elected to have a pre-termination hearing before Lott, where she presented evidence for Lott to consider in determining whether to approve or reject Davis' termination recommendation.  (Docs. 109-1 ¶ 229; 134-3 ¶ 229.)  Plaintiff was represented by counsel at the pre-termination hearing.  (Docs. 109-1 ¶ 230; 134-3 ¶ 230.)  During the pre-termination hearing, testimony was provided by Mote, Washington, Smith, Strum, and Plaintiff.  Based upon the documents and evidence presented, Lott terminated

Plaintiff's employment effective June 30, 2010. (Doc. 109-11 at 16; *see also* Docs. 109-1 ¶ 262; 134-3 ¶ 262.) Lott found that the cumulative consequence of her behavior, attitude, and misconduct created a hostile work environment for all other employees in the City Attorney's Office, that the hostile work environment was worsened and exacerbated by her insensitive use of racial slurs and disparaging references to the race of fellow employees, and that Plaintiff's colleagues suffered her tirades and gossip about fellow employees and other public figures. (*Id.*) Plaintiff's admission that she used the "N" word when referring to Smith was a significant factor in Lott's decision to terminate Plaintiff. (Doc. 109-11 at 17; *see also* Docs. 109-1 ¶ 263; 134-3 ¶ 263.)

With regard to professional conduct issues, Lott concluded that the evidence at the hearing clearly established that Plaintiff had a poor relationship with the Risk Management Office, failed to attend at least one deposition, refused to provide drafts of motions and briefs early as requested by Davis, procrastinated in preparing documents subject to deadlines, and failed to follow Davis' directives with regard to the preparation of certain legal documents. (Doc. 109-11 at 17; *see also* Docs. 109-1 ¶ 265; 134-3 ¶ 265.) As Lott had no legal training, he accepted Davis' opinions concerning Plaintiff's shortcomings as a licensed attorney. (Doc. 109-11 at 17; *see also* Docs. 109-1 ¶ 265; 134-3 ¶ 265.) Further, it was deemed undeniable that Plaintiff failed to satisfy the Coaching Plan, as she did not timely begin or complete the course on Interpersonal Relationships and did not produce the written strategy document. (Doc. 109-11 at 17-18; *see also* Docs. 109-1 ¶ 266; 134-3 ¶ 266.)

Lott represented that his decision to terminate Plaintiff's employment was made solely by him as City Manager and was not in retaliation for Plaintiff's discovery of Davis' gun, Plaintiff's revelation of the gun to Thomas, Thomas' subsequent report of the gun, the investigation and disciplinary action imposed upon Davis, or Plaintiff's race. (Doc. 109-11 at 18; *see also* Docs. 109-1 ¶ 269; 134-3 ¶ 269.) Lott further represented that neither Mayor Adams nor any Board members influenced his decision to terminate Plaintiff's employment. (Doc. 109-11 at 18; *see also* Docs. 109-1 ¶ 267; 134-3 ¶ 267.) Davis also represented that, other than submitting his recommendation for terminating Plaintiff and giving testimony at

16

Plaintiff's pre-termination hearing, he did not pressure or attempt to influence Lott's decision.  (Doc. 109-11 at 18; *see also* Docs. 109-1 ¶ 268; 134-3 ¶ 268.)

## DISCUSSION

Defendants move for summary judgment on each of Plaintiff's five remaining claims. (*See* Doc. 110.)

## I.    First Amendment Retaliation Claims

Plaintiff alleges in the SAC that she was retaliated against "for having exercised her First Amendment right to free speech by reporting in confidence a crime committed by defendant C. Nathan Davis, specifically, that he brought a (loaded) handgun into a public building in violation of Georgia law."  (Doc. 35 at 3.)  Based on this speech, Plaintiff's three remaining claims of first amendment retaliation are: (1) a claim against Defendant Lott in his personal capacity and Defendant City of Albany arising from her termination; (2) a claim against Defendant Davis in his personal capacity arising from retaliatory acts other than her termination; and (3) a claim against Defendants Adams, Hubbard, Pike, Marietta, Langstaff, Postell, Lott, and Davis in their personal capacities arising from Defendants' decision to hold closed, executive sessions and from news reports about Plaintiff's employment and her alleged racism and negligence as an attorney.  (*See* Docs. 66 at 19; 69.)  The speech underlying all three of Plaintiff's claims is her communication with EEO Manager Thomas. (*E.g.*, Docs. 35 at 4 (alleging that she reported her discovery of the gun to the EEO manager and was subsequently subject to retaliation); 134 at 20 (arguing that she was retaliated against "for having reported Davis' crime")).  Defendants move for summary judgment on each of these three claims.[5]

Under the First Amendment, governmental actors are prohibited from 'abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.  Further, "the law is well-

---

[5]     The Court notes that Defendants also argue that summary judgment on these claims is warranted to the extent they are based on Plaintiff's speech during a phone call made to a police officer friend.  (*See* Doc. 110 at 6.)  This phone call is not, however, alleged in the SAC or addressed in Plaintiff's response to the Motion.  (*See* Docs. 35; 134.)  Accordingly, the Court does not consider Plaintiff's First Amendment retaliation claims in relation to this phone call.

established that the state may not demote or discharge a public employee in retaliation for speech protected under the first amendment . . . ." *See Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989) (citing *Rankin v. McPherson*, 483 U.S. 378 (1987)).  A public employee's right to freedom of speech is not, however, "absolute," as "[her] interests are limited by the state's need to preserve efficient governmental functions." *Id.*; *see also Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1288 (11th Cir. 2000) ("The law recognizes . . . that the state has an interest as an employer in regulating the speech of its employees and attempts to balance the competing interests of the public employee and the state.").  To balance these competing interests, the Supreme Court set forth a four-step analysis in *Pickering v. Board of Education*, 391 U.S. 563 (1968).  *See Stanley*, 219 F.3d at 1288; *see also Bryson*, 888 F.2d at 1565.

The first step of the *Pickering* analysis, when used to analyze alleged government employer retaliation, is to "determine if an employee's speech has constitutional protection by deciding at the outset (1) if the government employee spoke as an employee or citizen and (2) if the speech addressed an issue relating to the mission of the government employer or a matter of public concern." *Boyce v. Andrew*, 510 F.3d 1333, 1342 (11th Cir. 2007) (citing *D'Angelo v. Sch. Bd. of Polk Cty., Fla.*, 497 F.3d 1203, 1209 (11th Cir. 2007)).  "To qualify as constitutionally protected speech in the First Amendment government employment retaliation context that warrants the *Pickering* analysis, . . . the speech must be made by *a government employee speaking as a citizen and be on a subject of public concern*." *Id.* at 1342-43 (emphasis in original).  If the government employee "was speaking as an employee [and not as a citizen], then there can be no First Amendment issue, and the constitutional inquiry ends with no consideration of the *Pickering* test." *Id.* at 1343; *see also id.* at 1342 (explaining that the Supreme Court held "that 'when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline'"); *Carcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created.").

18

"When a public employee speaks as an employee on matters of personal interest and not as a citizen upon matters of public concern, the First Amendment is not implicated." *Villa v. Padron*, 484 F.3d 1334, 1339 (11th Cir. 2007). Additionally, when "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. The decision "whether a government employee's speech relates to his or her job as opposed to an issue of public concern 'must be determined by the content, form, and context of a given statement, as revealed by the whole record.'" *Boyce*, 510 F.3d at 1343 (quoting *Connick*, 461 U.S. at 147-48). The Eleventh Circuit has instructed that courts "review restrictions on employees' speech with greater deference in order to balance the government employer's legitimate interests in its mission." *Id.* (quoting *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 995 (9th Cir. 2007)).

The undisputed facts demonstrate that Plaintiff was not speaking as a citizen upon a matter of public concern. Rather, she spoke as a government employee regarding a personal grievance, and her speech was within the scope of her official duties. "A 'public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run.'" *Boyce*, 510 F.3d at 1344. Indeed, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147. Accordingly, "there can be no First Amendment issue" in this case and the Court need not conduct the remainder of the *Pickering* test.[6] *See Boyce*, 510 F.3d at 1343.

---

[6] Plaintiff argues that the Court previously determined that she satisfied the first prong of the *Pickering* analysis during the motion-to-dismiss phase of the case. (Doc. 134 at 21-22 ("The Court has already concluded that Plaintiff spoke on a matter of public concern. Doc. 66 p. 9.").) Plaintiff misunderstood the Court's prior ruling. At the motion-to-dismiss stage, the Court was solely determining whether Plaintiff had stated a plausible claim for relief. The Court merely found that a reasonable inference could be drawn that

In *Boyce v. Andrew*, the plaintiffs claimed they were terminated from their jobs at DeKalb Division of Family and Children Services ("DFCS") because they complained about their heavy caseloads and about mismanagement. *Boyce*, 510 F.3d at 1337-40. The Eleventh Circuit determined that the plaintiffs' complaints were "intended to address only matters connected with their jobs at DeKalb DFCS" because the complaints were made internally to supervisors—the complaints "were not sent to an outside entity, like the teacher's letter to a newspaper in *Pickering*"—and the complaints "did not address any subject not personal to [their] working conditions at DeKalb DFCS." *Id.* at 1343-44 (emphasizing that the complaints concerned "personal working conditions without reference to any particular family, child, or case"). The Eleventh Circuit found that "[t]he purpose of [the plaintiffs'] grievances clearly was not to raise public awareness about children within the care of DeKalb DFCS. If that had been their intention, then they would have identified the children who were in danger. . . . The record shows that this was an internal employee matter . . . ." *Id.* at 1346. In *Boyce*, "the 'controlling factor' was that [the plaintiffs'] expressions were made pursuant to official duties and 'the main thrust of [their] speech took the form of a private employee grievance.'" *Id.* (internal citation omitted).

Likewise, here, Plaintiff's statement to Thomas was not made to raise public awareness about the dangerous situation. Rather, she was motivated to tell Thomas about the gun out of fear for her personal safety. Upon finding the gun, Plaintiff became frightened because she thought that Davis hated her and brought the gun to shoot her. According to Plaintiff, she spoke to Thomas, in part, because Thomas was "a personal friend" and because she needed to "get this [information] off her chest and telling Thomas made it less of a burden and made it feel less dangerous" for Plaintiff. Plaintiff told Thomas about the gun in confidence, asked Thomas to promise not to tell anyone about the gun, and expected Thomas to honor her promise. Based on these facts, Plaintiff's speech can be categorized as an employee disclosing a personal and internal grievance. Not only was Plaintiff's speech made in private to a personal friend, but it was clearly not made for the

---

her complaint was a matter of public concern. (Doc. 66 at 10-11.) At this stage, more is required of Plaintiff to survive a motion for summary judgment. *See Mason*, 24 F. Supp. 3d at 1260; M.D. Ga. L.R. 56.

purpose of shedding light on what Plaintiff discovered.  Plaintiff did not tell an outside entity about the gun and she did not speak to Thomas for the purpose of bringing public awareness to the gun's presence in the City Attorney's Office.

Furthermore, Plaintiff's speech was within the scope of her official duties.  The inquiry of assessing a public employee's duties is a "pragmatic one" that is not limited to "those tasks that are specifically designated" or enumerated.  *Phillips v. City of Dawsonville*, 499 F.3d 1239, 1242 (11th Cir. 2007) (citing *Garcetti*, 547 U.S. at 425).  The Eleventh Circuit held in *Phillips* that the plaintiff's disclosure about the former mayor's misuse of city funds, property, and services for personal benefit was not speech protected by the First Amendment.  *Phillips*, 499 F.3d at 1242.  The plaintiff served as the city clerk and city treasurer, and, "[a]lthough her enumerated duties did not specify reporting misconduct by the Mayor, it was within her official duties to inquire about and make statements on the potentially inappropriate use of the City resources."  *Id.* at 1242.  The Eleventh Circuit rejected the plaintiff's argument that she was speaking as a citizen because "her speech—reporting the then Mayor's seeming misconduct—fell outside the scope of her official *enumerated* duties."  *Id.* at 1242 (emphasis in original).  After conducting the "pragmatic" assessment of the scope of the plaintiff's duties, the Eleventh Circuit determined that the plaintiff's position "gave her some control over and accountability for City funds and placed her in a supervisory role over some staff" and, accordingly, concluded that "the reporting here of the improper use of city resources and of behavior that might well result in expense and even liability for the City was speech pursuant to Plaintiff's official duties" that was not protected by the First Amendment.  *Id.* at 1242-43.

Similarly, Plaintiff's speech to Thomas was within the scope of her official duties and, accordingly, cannot be the basis for a First Amendment retaliation claim.  One of Plaintiff's duties as an Assistant City Attorney was to "ensur[e] departmental compliance with all applicable City codes, laws, rules, regulations, standards, policies and procedures" and "initiat[e] any actions necessary to correct violations." Prior to the gun incident, Plaintiff previously had spoken about various city employees who were violating city rules and laws. For example, Plaintiff reported a police officer for cheating, a building inspector for

improperly soliciting business, and the Risk Manager for misdemeanor assault. Plaintiff's reporting of the unlawful possession of a handgun on City property fell within the scope of her duties as Assistant City Attorney and was consistent with her prior actions as an Assistant City Attorney. Accordingly, Plaintiff's First Amendment claims, stemming from her statement to Thomas, fail as the speech at the center of her claims is not protected.

## II.    Hostile Work Environment Claim[7] Against Defendant Davis

At the Motion to dismiss stage, the Court held that Plaintiff had sufficiently alleged a 42 U.S.C. § 1981 race discrimination claim from a hostile work environment brought under 42 U.S.C. § 1983 against Davis in his personal capacity. Plaintiff alleged that Davis "attempted to sabotage [Plaintiff's] work product and reputation by destroying her evidence and assigning her cases without telling her," and that Davis did not take these same actions against Plaintiff's black coworkers. (Doc. 66 at 16.) Defendants now move for summary judgment on this claim.

"To have a cause of action pursuant to § 1983, the plaintiff must allege that a person deprived her of a federal or constitutional right and that the person was acting under color of law." *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995). Under color of law is defined as "acting with power possessed by virtue of the defendant's employment with the state." *Id.* Plaintiff's allegations regarding Davis' actions constitute action under color of law, and Defendant Davis does not contest this. Thus, the issue is whether Plaintiff has been deprived of her federal or constitutional rights.

A hostile work environment claim is a form of a claim of discrimination through disparate treatment. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010). To prove a hostile work environment claim, "a plaintiff must show that she was discriminated against because of her membership in a protected group, and that the offensive conduct was either severe or pervasive enough to alter the terms or conditions of employment . . . ." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010);

---

[7]    The Eleventh Circuit has noted that hostile work environment claims "brought under the Equal Protection Clause, 42 U.S.C. § 1981, or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, are subject to the same standards of proof and employ the same analytical framework." *Bryant*, 575 F.3d at 1296 n.20.

*Bryant v. Jones*, 575 F.3d 1281, 1296 (11th Cir. 2009) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 133 (2004)) (requiring the plaintiff to show "harassing behavior 'sufficiently severe or pervasive to alter the conditions of [her] employment'"). The employee does this by proving five elements: "(1) that [she] belongs to a protected group; (2) that [she] has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee . . . ; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment;" and (5) that there is a basis for liability under either a theory of vicarious or of direct liability. *Bryant*, 575 F.3d at 1296 (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).

A.   **Whether the Harassment Was Based on Plaintiff's Protected Characteristic**

The first element, that Plaintiff is a member of a protected group, is met as Plaintiff is white. Furthermore, there is a genuine issue of material fact as to whether Plaintiff was subjected to unwelcome harassment. The third element of a hostile work environment claim requires the plaintiff to demonstrate that "the harassment [was] based on a protected characteristic of the employee . . . ." *Bryant*, 575 F.3d. at 1296. "[O]nly conduct that is 'based on' a protected category . . . may be considered in a hostile work environment analysis." *Byrd v. Postmaster General*, 582 F. App'x 787, 790 (11th Cir. 2014) (citing *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583-84 (11th Cir. 2000), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)); *see also Laosebikan v. Coca-Cola Co.*, 167 F. App'x 758, 765-66 (11th Cir. 2006) (affirming summary judgment for defendant on claim of hostile work environment, in part, because "[v]irtually all of the complained-of incidents are entirely devoid of racial content"). "'[I]nnocuous statements or conduct, or boorish ones' unrelated to a protected ground are not counted. [The discrimination laws] [do] not enact a 'general civility code' and [do] not make actionable ordinary workplace tribulations." *Byrd*, 582 F. App'x at 790 (internal citation omitted).

Plaintiff's claim rests on the argument that Davis treated her differently than Smith, who is black. (*E.g.*, Docs. 134 at 38-42; 134-1; 134-2 ¶¶ 6-7.) Specifically, Plaintiff claims:

(1) Smith was hired despite being "unqualified"; (2) Plaintiff was not assigned cases or given opportunities to make presentations to the Board, whereas Smith was assigned many cases, made presentations to the Board, and was invited to lunches and other meetings; (3) Smith was allowed to travel to out-of-state seminars and training courses, while Plaintiff was not permitted to do so; (4) Davis treated Plaintiff with "extreme disrespect over a period of years" and attempted to paint her as a racist, whereas Smith was treated with "the utmost respect"; (5) Davis doubled Smith's salary within 21 months of her employment at the City, such that she was making approximately what Plaintiff made; and (6) Davis gave Plaintiff poor reviews while giving Smith "glowing performance evaluations. (*E.g.*, Docs. 134 at 38-42; 134-1; 134-2 ¶¶ 6-7.)

Plaintiff has not established that any of this conduct was "based on" her race. *Byrd*, 582 F. App'x at 790; *see also Perry v. Rogers*, 627 F. App'x 823, 836 (11th Cir. 2015) ("Because [plaintiff] has not demonstrated that any of these instances were racially motivated, however, she cannot rely on them in support of her hostile-work-environment claim."). At most, Plaintiff has established that she received disparate treatment when compared to Smith and that Smith was of a different race. The Eleventh Circuit has not held that discrete acts of disparate treatment can be used to analyze a hostile work environment claim.[8] Thus, it is not clear whether Plaintiff can satisfy the third element of her claim. However, as discussed below, Plaintiff has not established the fourth element.

### B.    Whether the Harassment Was Sufficiently Severe or Pervasive

The evidence does not establish that any harassment suffered by Plaintiff was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." *Bryant*, 575 F3d. at 1296. Harassment is severe or pervasive only when "both subjectively and objectively severe and pervasive. Harassment is subjectively severe and pervasive if the complaining employee perceives the harassment as severe and pervasive, and harassment is objectively severe and pervasive if a reasonable person in the plaintiff's position would adjudge the harassment severe and

---

[8]    In *Perry v. Rogers*, 627 F. App'x 823 (11th Cir. 2015), the Eleventh Circuit "assume[d] without deciding that discrete acts of disparate treatment can be used in analyzing a hostile work environment claim." 627 F. App'x at 836 n.9.

pervasive." *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (internal citation omitted). "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Mendoz v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (internal quotations removed).   The factors considered to assess the objective prong are:   "'the frequency of the conduct,' 'the severity of the conduct,' 'whether the conduct is physically threatening or humiliating, or a mere offensive utterance,' and 'whether the conduct unreasonably interferes with the employee's job performance.'" *Johnson*, 234 F.3d at 509; *see also Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002).   "Isolated or sporadic incidents of harassment do not satisfy the 'severe or pervasive' standard of a hostile work environment claim." *Mosley v. MeriStar Management Co., LLC*, 137 F. App'x 248, 252 (11th Cir. 2005) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)). Furthermore, "[d]iscrete acts cannot alone form the *basis* of a hostile work environment claim," although they can be considered. *Gowski v. Peake*, 682 F.3d 1299, 1312-13 (11th Cir. 2012) (emphasis in original).   Rather, the claim "addresses acts different in kind whose very nature involves repeated conduct, such as discriminatory intimidation, ridicule, and insult." *Gowski*, 682 F.3d at 1312-13 (citing *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008)) (internal quotations omitted).

Plaintiff has pointed to specific incidents and events that she believes were motivated by race.   In *Perry*, the Eleventh Circuit affirmed summary judgment in favor of an employer despite evidence that one of the plaintiffs was subject to two discrete acts that could be considered race discrimination through disparate treatment and was also aware of four racially-charged remarks. *Perry*, 627 F. App'x at 841.   The court could not "conclude that the incidents experienced by [the plaintiff] could lead a reasonable jury to conclude that she suffered the type of severe and pervasive sustained harassment over her five-and-one-half years of employment that rises to the level of a hostile work environment." *Id.*   "Although no magic number exists to enable a plaintiff to establish the harassment necessary to make out a hostile-work-environment claim, it is the 'repeated incidents of [ ] harassment that continue despite the employee's objections [that] are indicative of a hostile work

25

environment.'"  *Id.*; *see also Reeves*, 594 F.3d at 812 (reversing summary judgment for defendant where plaintiff claimed the "offensive conduct occurred 'every single day,' and that the manager 'accepted and tolerated that same behavior' over her repeated complaints").

The conduct underlying Plaintiff's claim is not sufficiently severe or pervasive to withstand summary judgment.  In *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240 (11th Cir. 2014), the court found that a Plaintiff had been subjected to harassing behavior where the plaintiff, who was black, discovered a noose in the breakroom, "observed a white employee, who called black employees 'boy' and 'monkey,' kick a black employee," saw white employees wear the Confederate flag "every morning," and learned of "racist graffiti in the men's restroom [that] depicted her, the caption [of which] included a threatening and humiliating racial slur, and her supervisor told her about the drawing while pretending to masturbate."  *Id.* at 1251-52.  In contrast, the Eleventh Circuit held that another plaintiff could not survive summary judgment even though, over the course of his two years of employment, he "saw his coworkers wear the Confederate flag on a regular basis," "saw racist graffiti in the men's restroom that he used on a daily basis," heard racial slurs "a few times," and "heard about the noose in the breakroom."  *Id.* at 1254.  Considering the totality of the circumstances, the Eleventh Circuit concluded that a reasonable jury would not find that "his workplace was objectively hostile" because his exposure to racist graffiti and the Confederate flag "was not directly humiliating or threatening," the racial slurs were heard "only a few times over several years" and were not directed to him by a supervisor, and he did not see the noose in the breakroom.  *Id.*

Similarly, based on the totality of the circumstances, Plaintiff has not demonstrated that the complained-of harassment, which spanned over four years, was sufficiently severe or pervasive to alter the terms and conditions of her employment.  Although Plaintiff had conflicts with co-workers and believed she was not afforded the same treatment as Smith, Plaintiff was not the target of racial epithets or any humiliating or threatening conduct, and her evidence of racial animus could just as easily be viewed as being rooted in personality conflicts between Plaintiff and her co-workers. Plaintiff has identified various isolated incidents that were not, even when viewed cumulatively, severe or pervasive nor overtly

racist, humiliating, physically threatening, or discriminatory.   Thus, Plaintiff has failed to establish the fourth element of her claim.

### III.   Disparate Treatment Claim Against Defendants Lott and the City of Albany

Plaintiff's claim, asserted against Defendant City of Albany  and Defendant Lott in his personal capacity, brought under 42 U.S.C. § 1983, is for 42 U.S.C. § 1981 race discrimination based on disparate treatment.  This claim is premised on Plaintiff's termination.  (Doc. 66 at 7.)

Defendants argue that there is no direct evidence of racial discrimination and that Plaintiff fails to satisfy the *McDonnell Douglas* burden-shifting mechanism through indirect evidence.  (Doc. 110 at 38-39.)  In response, Plaintiff does not point to any direct evidence, arguing instead that she can carry her burden through indirect evidence.  (*See* Doc. 134 at 34.)  Under the three-step *McDonnell Douglas* procedure, "[P]laintiff must create an inference of discrimination by establishing a *prima facie* case.  If [she] does so, the defendant[s] must 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.'  The [P]laintiff may then attempt to show that these reasons are pretextual or may present other evidence to show that discriminatory intent was more likely the cause of the employer's actions."  *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1184 (11th Cir. 1984) (internal citations omitted).[9]

#### A.   Plaintiff's *Prima Facie* Case

"To make out a *prima facie* case of racial discrimination [under 42 U.S.C. § 1983] a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably."  *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003)).  Defendants concede that Plaintiff can make the requisite showing to establish her

---

[9]      The Court notes that the *McDonnell Douglas* mechanism is "only a tool," because the "'ultimate question' in a disparate treatment case is not whether the plaintiff established a *prima facie* case or demonstrated pretext, but 'whether the defendant intentionally discriminated against the plaintiff.'"  *Nix*, 738 F.2d at 1184 (internal citations omitted).

*prima facie* case.[10]   (Doc. 110 at 39.)  Accordingly, the burden shifts to Defendants Lott and City of Albany.

### B.   Defendants' Reason for Plaintiff's Termination

Defendants Lott and City of Albany have the burden to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination. *Nix*, 738 F.2d at 1184. "This intermediate burden is 'exceedingly light.'" *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997). Defendants must merely proffer, not prove, non-discriminatory reasons for their actions. *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994). Defendants argue that Plaintiff's termination was not due to racial discrimination, but due to her negative attitude, her use of racial, insulting, or insensitive language regarding others, her failure to complete a coaching plan, and her failure to adequately do her job as an assistant city attorney. (Doc. 110 at 40-41.) These facts, Defendants claim, are "numerous legitimate, nondiscriminatory reasons for [Plaintiff's] termination," which shifts the burden to Plaintiff to show the articulated reasons are pretext for a discriminatory decision." (Doc. 110 at 41-42.)

Defendants have clearly carried their "exceedingly light" burden.  The evidence is uncontroverted that Plaintiff repeatedly exhibited a poor attitude, used disparaging and derogatory words around and about other City employees, performed poorly as an attorney, and failed to complete the Coaching Plan. Accordingly, the burden shifts back to Plaintiff.

### C.   Plaintiff's Burden to Show Pretext

As Defendants have articulated legitimate, nondiscriminatory reasons for Plaintiff's termination, "the burden of production shifts to [Plaintiff] to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).  "This demonstration merges with the plaintiff's ultimate burden of showing that the defendant intentionally discriminated against the plaintiff." *Holifield*, 115 F.3d at 1565 ("[T]he ultimate issue in the case becomes whether the plaintiff has proven that the employer intentionally discriminated against [her] because of

---

[10]      In the motion to dismiss phase of the case, the Court found that Defendants Lott and City of Albany similarly "essentially admit[ted] that Strang stated a *prima facie* disparate treatment claim."  (Doc. 66 at 17.)

[her] race."). The Eleventh Circuit has explained that the plaintiff "must meet the reason proffered head on and rebut it." *Crawford*, 482 F.3d at 1308; *see also Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004) ("If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. Quarreling with that reason is not sufficient.") (internal citation omitted). "The focused inquiry in the last step requires the plaintiff to demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). "Put another way, once the employer succeeds in carrying its intermediate burden of production, the ultimate issue in the case becomes whether the plaintiff has proven that the employer intentionally discriminated against [her] because of [her] race." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997).

Defendants argue that Plaintiff cannot rebut the nondiscriminatory reasons articulated for Plaintiff's termination and that, accordingly, Plaintiff's claim cannot survive summary judgment. (Doc. 110 at 42.) In response, Plaintiff argues that she provides evidence of the "racially discriminatory atmosphere in the city attorney's office," of which she was a victim and not a perpetrator. (Doc. 134 at 41.) This evidence purportedly demonstrates that the reasons proffered by Defendants Lott and the City for Plaintiff's termination are unworthy of credence. (Doc. 134 at 41-42 (citing *Pinder v. John Marshall Law School, LLC*, 11 F. Supp. 3d 1208, 1220 (N.D. Ga. 2014)).)

Summary judgment in favor of Defendants is warranted as Plaintiff has not carried her burden of showing that Defendants' purported reasons are a pretext for illegal discrimination. Where, as in this case, the defendants proffer "more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford*, 482 F.3d at 1308 (citing *Chapman v. Al Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc)). Plaintiff fails to rebut each of the proffered reasons "head on," as she makes only general arguments about the office's atmosphere and provides

anecdotes about her former colleagues. In her response to the Motion, Plaintiff points to three pieces of evidence that she claims carry her burden.  First, she argues that the City's personnel manual "described black persons as 'priority' persons" and that this demonstrates the City's bias against white employees.  (Doc. 134 at 35 (citing Docs. 125 at 24-26; 122-4 at 66-68).)  This personnel manual is, however, irrelevant because "Priority Persons" was limited to "black persons designated by the Court in the Permanent Injunction" issued in a separate case. (Doc. 122-4 at 68.)  Furthermore, there is no evidence that Plaintiff was discriminated against or terminated because of this permanent injunction. Second, Plaintiff argues that Lott was reportedly prejudiced against black professional females.  (Doc. 134 at 35.)  This too is irrelevant, as whether Lott was believed by others to be prejudiced against black professional women has no bearing on whether Plaintiff, a white professional woman, was terminated or discriminated against because of her race. Third, Plaintiff points to deposition testimony provided in another case by Krista Newton, a City employee who acted in a supervisory role.  (Doc. 134 at 36-37 (citing Doc. 120-6).)  Newton testified that Lott had asked her to use race as a consideration when making employment decisions.  (*Id.*) There is, however, no testimony that Lott's decision to terminate Plaintiff was based on race. Furthermore, Plaintiff failed properly to controvert Lott's representation that his decision to terminate Plaintiff in this case was not based on her race.

In addition, Plaintiff agreed that many of the critical things said about her by her current and former colleagues, which were the basis for her termination, were accurate.  She admitted that: (1) she did not finish the course on Interpersonal Relationships within 30 days of the start of the Coaching Plan; (2) she did not create the written strategy document require by the Coaching Plan; (3) she owed the City money for various expenses; (4) she did not get motions and briefs to Davis when he requested them so that he could review her work product; (5) she called Smith the "N" word about a year before the pre-termination hearing; (6) she repeated malicious gossip about fellow employees and other public figures, including referring to at least one other City employee as "bitch"; and (7) she said that Wes Smith was "a white token." Furthermore, Plaintiff did not properly controvert Lott's

representation that his decision to terminate Plaintiff was based on these nondiscriminatory reasons and was not based on Plaintiff's race.  (Doc. 134-3 ¶ 269 (emphasis omitted).)

Accordingly, Plaintiff has failed to rebut each of the legitimate, nondiscriminatory reasons proffered by Defendants for Plaintiff's termination. Defendants are, therefore, entitled to summary judgment on Plaintiff's claim of race discrimination based on disparate treatment.

## CONCLUSION

For the reasons articulated below, Defendants' Motion for Summary Judgment (Doc. 109) is **GRANTED**.  It is hereby **ORDERED** and **ADJUDGED** that Plaintiff Strang shall take nothing and **JUDGMENT** shall be entered in favor of Defendants.

**SO ORDERED**, this 8th day of March, 2017.

_____/s/ Leslie J. Abrams_____
**LESLIE J. ABRAMS, JUDGE**
**UNITED STATES DISTRICT COURT**